305 Ga. 136
FINAL COPY

S18A1589. PARKER v. THE STATE.

BLACKWELL, Justice.

James Don Parker was tried by a Jones County jury and convicted of the murder of Alan Helmuth. Parker appeals, claiming that the trial court erred when it charged the jury and that he was denied the effective assistance of counsel. We see no reversible error and affirm.[1]

1. Viewed in the light most favorable to the verdict, the evidence shows that Parker and Helmuth were best friends and neighbors in rural Jones County, near Haddock. At the time of his death, Helmuth was 61 years of age, and he suffered from a variety of medical conditions, including gout, diabetes, and a lung disease that often left him short-winded and dizzy. Parker, who described himself as "a lot healthier and a lot younger" than

---

[1] Helmuth was killed on February 10 or 11, 2014. In June 2014, a Jones County grand jury indicted Parker, charging him with two counts of murder (one count of malice murder and one count of felony murder). Parker was tried in January 2015, and the jury found him guilty on both counts. The trial court sentenced Parker to imprisonment for life for malice murder, and it purported to merge the felony murder into the malice murder, although the felony murder count actually was vacated by operation of law. See Malcolm v. State, 263 Ga. 369, 372 (4) (434 SE2d 479) (1993). Parker filed a timely motion for new trial in February 2015, which he amended in July 2016, August 2016, June 2017, and December 2017. The trial court denied the motion for new trial in May 2018, and Parker filed a timely notice of appeal. His appeal was docketed in this Court for the August 2018 term, and the Court heard oral argument on November 5, 2018.

Helmuth,[2] was about eight inches shorter than his friend, but the men weighed about the same.

On the evening of February 10, 2014, Parker invited Helmuth to drink moonshine at Parker's house. Helmuth told his wife that he would not be gone for long, but he never returned. Around seven o'clock on the morning of February 11, Parker appeared at the home of another neighbor and asked that neighbor to "call the law." When police officers responded to Parker's home, they found Helmuth's body. He had been shot once in the forehead and once in the side of his face.[3] The shot to the forehead left a bullet lodged in his brain, and the shot to the side of his face travelled through his neck and left a bullet lodged in his left lung.[4] Parker was arrested, and as he was booked at the jail, he spontaneously said, "That's what moonshine [will] do to you."

At his trial, Parker testified that he killed Helmuth in self-defense. By Parker's account, Helmuth was in good spirits when he came over, and he did

---

[2] The record shows that Parker was 56 years of age, but evidence of his exact age does not appear to have been presented to the jury.

[3] At trial, Parker and the State disputed the sequence in which the shots were fired. The State presented evidence that the first shot was to Helmuth's forehead, but Parker testified that the shot to the forehead came second. The State also presented evidence that neither of the shots would have been instantly fatal but that the shot to the forehead would have immobilized Helmuth.

[4] The medical examiner testified that this bullet "went through the soft tissue of the left face, the left neck, and actually exited, and then immediately reentered the body, at the base of the left neck and continued into the chest. And the bullet went through and lodged in the left lung."

not appear to be angry when Parker told him that he was not as tough as he used to be. As the men continued drinking, however, Helmuth's mood changed. According to Parker, Helmuth spoke of his need to demonstrate that he "really [was] a badass," and he then hit Parker in the face. Helmuth continued to hit Parker and eventually knocked him out. Up to that point, Parker said, he never hit back. When Parker came to, Helmuth was slapping him in the face and telling him to get up. When Parker did not respond, Helmuth kicked him and announced that the beating would continue until Parker stood. At that point, Parker stood, and Helmuth continued to beat him with his fists. Parker testified that he repeatedly tried to escape, but Helmuth blocked him each time. Finally, Parker said, Helmuth knocked him into his bedroom, where Parker was able to retrieve his Marlin .22-caliber lever-action rifle. (On cross-examination, Parker acknowledged that — at the time that he was in his bedroom getting the gun — Helmuth was approximately 15 feet away in the living room, and Parker testified that he "didn't think to" close or lock the door to his bedroom.)[5] Parker claimed that he told Helmuth to leave his house, and Helmuth refused, saying "You'll have to kill me because I'm fixing to keep on whipping your ass." Parker said that Helmuth

---

[5] The trial court charged the jury about no duty to retreat.

then lunged at him, and he shot at Helmuth. When Helmuth came at Parker a second time, he shot Helmuth again. Parker acknowledged that he then "collapsed onto [his] bed," and he fell asleep without checking on his friend or attempting to seek help for him.

Much of the physical and medical evidence is inconsistent with Parker's account. For example, photographs and testimony admitted at trial show that, when Parker was arrested and booked on the morning of February 11, he had only minor bruising and a few superficial cuts on his face (none of which required medical treatment other than cleaning). And he had no significant bruising or defensive injuries on his torso or arms consistent with being kicked or punched in the way he described.

Parker does not dispute that the evidence is sufficient to sustain his conviction. But consistent with our usual practice in murder cases, we independently have reviewed the record to assess the legal sufficiency of the evidence. We conclude that the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Parker was guilty of murder. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Parker claims that the trial court erred when it charged the jury about how it should consider evidence of his good character. The trial court gave the pattern jury instruction on good character evidence, charging the jury as follows:

> You have heard evidence of the character of the defendant in an effort to show that the defendant likely acted in keeping with such character or trait at pertinent times, or with reference to the issues of this case. This evidence has been offered in the form of opinion of other witnesses, reputation, and specific incidences of conduct of the defendant showing such trait. You should consider any such evidence along with all the other evidence in deciding whether or not you have a reasonable doubt about the guilt of the defendant.

See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed. 2007, updated Aug. 2018) § 1.37.10 (same). Parker argues that the pattern charge is inadequate because it does not include language that is required, he says, by State v. Hobbs, 288 Ga. 551 (705 SE2d 147) (2010). But "[n]othing in Hobbs suggests that it is error to give the current version of the pattern jury charge on good character." Williams v. State, 304 Ga. 455, 459 (3) (818 SE2d 653) (2018). Despite Parker's claim to the contrary, the pattern charge adequately communicated to the jury that evidence of his good character could generate a reasonable doubt to acquit, and it "properly explained how character evidence ought to be considered by the jury." Id.

3. Parker also challenges a charge in which the jury was instructed that "[a] person who fatally wounds another, even in self-defense, is not entitled to hasten the victim's death by continuing to pump bullets into the victim's body."[6] This charge was provided twice to the jury (first as a part of the initial charge and again in a recharge after the jury requested definitions of numerous terms). But Parker did not object to the charge on either occasion, so we review this claim only for plain error. See OCGA § 17-8-58 (b).[7]

To show plain error, Parker "must establish not only that the jury instruction was erroneous, but also that it was obviously so and that it likely affected the outcome of the proceedings." DuBose v. State, 299 Ga. 652, 654 (4) (791 SE2d 9) (2016) (citation and punctuation omitted). He has failed to

---

[6] This charge was crafted by the State based upon dicta contained in Brown v. State, 249 Ga. 805 (294 SE2d 510) (1982), and quoted in Adams v. State, 274 Ga. 854, 856 (3) (561 SE2d 101) (2002). It is not part of any pattern instruction suggested by the Council of Superior Court Judges of Georgia.

[7] Parker explicitly consented to the charge before the initial charge, and he did not object after the initial charge. When the jury requested definitions of various terms soon after it began deliberations, it was Parker who requested that the "whole group" of charges (including the charge on hastening a death) be included in the recharge. As the trial judge listed the various charges that should be included in the recharge, Parker then added with respect to the charge on hastening a death: "I don't need that one again." But when Parker subsequently went over the charges that should be included and the trial court again commented that the charge on hastening a death should be given, Parker responded, "Yeah." And when the trial court summarized that the only changes to the recharge would be the removal of the charges on the form of the verdict and intoxication (without saying anything about the removal of the charge on hastening a death), Parker said, "Right," and he confirmed that he had no objections or concerns to the recharge both before and after it was given. We will assume without deciding that Parker did not affirmatively waive the alleged error. See Woodard v. State, 296 Ga. 803, 809 (3) (a) (771 SE2d 362) (2015) ("[T]here is no plain error where the defendant 'affirmatively waived' the alleged error.").

make the necessary showing of harm. First, it is true that the bullet-pumping charge was not well tailored to the evidence because it was undisputed that only two shots were fired at Helmuth and that Parker did not "pump [multiple] bullets" into Helmuth's body. But the State did not suggest otherwise, and Parker was able to argue to the jury in his closing that the bullet-pumping charge "doesn't apply here at all" because there were only "two bullets shot." Second, the bullet-pumping charge on its own did not properly inform the jury that a defendant who is justified in using deadly force is entitled to continue to use deadly force until the reasonably perceived threat of unlawful force is eliminated, and standing alone, that charge is arguably inconsistent with the usual rule of self-defense. But the jury was separately charged that "[j]ustification cannot be based on a deadly assault which has been completely ended, unless the assailant has some further apparent ability to continue it" and that "the doctrine of reasonable fear does not apply . . . where . . . the danger apprehended is not urgent and pressing or apparent at the time of the killing," and these instructions adequately conveyed the idea that justification to use force in defense of self continues for so long as the reasonable perception of the threat persists. Considering the jury charges as a whole, Parker has not shown any likelihood that the jury

believed a defendant could be convicted of murder if the fatal shot was fired while he continued to reasonably believe that the force he employed was necessary to defend himself. See Gadson v. State, 303 Ga. 871, 875 (2) (815 SE2d 828) (2018) ("In evaluating claims of instructional error, we examine the jury charge as a whole." (citation and punctuation omitted)).

Parker also argues that the jury charge on hastening a death violated OCGA § 17-8-57 because it intimated that the trial judge believed that Parker had no reason to fire the second shot at Helmuth. But the trial court informed the jury that "[w]hat the facts are in this case is a matter solely for you, the jury, to determine," that "[a] person is justified in . . . using force against another person when and to the extent he reasonably believes that such . . . force is necessary to defend himself," and that "[t]he State has the burden of proving beyond a reasonable doubt that the defendant was not justified." There is no likelihood that the jury considered the charge on hastening a death as an indication that the trial court believed the State's theory that Parker was not in fear for his safety when he fired the second shot. See Scudder v. State, 298 Ga. 438, 441 (4) (782 SE2d 638) (2016). See also Dubose v. State, 294 Ga. 579, 586 (5) (755 SE2d 174) (2014) (the "court's

determination regarding what jury instructions were authorized by the evidence" did not violate OCGA § 17-8-57).

4. Parker claims that he was denied the effective assistance of counsel when his lawyer failed to call an expert witness, strike a juror based upon his relationship with the Jones County Sheriff's Department, and sufficiently investigate the case. To prevail on a claim of ineffective assistance, Parker must prove both that his lawyer's performance was deficient and that he was prejudiced by this deficient performance. Strickland v. Washington, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of his lawyer was deficient, Parker must show that the lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also Kimmelman v. Morrison, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that he was prejudiced by the performance of his lawyer, Parker must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland,

466 U. S. at 694 (III) (B). This burden is a heavy one, see <u>Kimmelman</u>, 477 U. S. at 382 (II) (C), and we conclude that Parker has failed to carry it.[8]

(a) Parker alleges that his trial counsel should have called an expert witness in crime scene analysis to support his justification defense. At the hearing on Parker's motion for new trial, an expert witness testified that it was possible that Helmuth was standing when he was shot in the side of his face, which contradicted the State's claim that this shot was fired after Helmuth had fallen to the floor. Indeed, in its closing argument, the prosecuting attorney said that it was "scientifically impossible" for this shot to have been fired while Helmuth was standing.[9] But even if a jury were to find this expert's testimony to be credible,[10] Parker has not shown that there

---

[8] Parker also asserts that he was denied the effective assistance of counsel when his lawyer failed to object to the jury charge on hastening a death, as described in Division 3. But the "test for harm under plain error review is equivalent to the test in ineffective assistance of counsel cases for whether an attorney's deficient performance has resulted in prejudice of constitutional proportions." <u>Martin v. State</u>, 298 Ga. 259, 278 (6) (c) (779 SE2d 342) (2015). As a result, Parker's ineffective assistance claim based on this jury charge is without merit.

[9] When discussing the "impossibility" of Parker's claim that Helmuth was standing when he was shot in the face, the prosecuting attorney also (twice) said in her closing argument that the only way Helmuth could have been standing is if he was bent at nearly a 90 degree angle, with his face down. This is not too different from the position that Parker's expert said Helmuth could have been in if he was shot while lunging at Parker.

[10] The trial court made no finding about the credibility of the expert witness in its order denying Parker's motion for new trial. On appeal, it is difficult for us to determine how credible a jury would find the expert's testimony, especially given that the State's cross-examination of the expert at the hearing on Parker's motion for new trial consisted almost solely of getting the expert to admit that he believed it was possible that the killing happened in the way alleged by the State. We do note, however, that the expert's "re-enactment" illustration, which he used to argue that Helmuth could have been standing when he was shot in the face, illustrates a model with a bullet entering the face and exiting the lower jaw (but not the neck), whereas the medical examiner

is a reasonable probability that the expert's testimony would have made a difference in his trial. The expert acknowledged that he was unable to say that Parker's claim about Helmuth's orientation when he was shot in the face had a "greater probability" than the claim proposed by the State. In any event, Helmuth's orientation at the time he was shot in the face was not a crucial part of the State's case. To the contrary, the State's closing argument focused on seven "lies" that Parker told and that undermined his justification defense, and only one of those "lies" related to Helmuth's orientation.[11] And because Parker has not shown a reasonable probability that the result of his trial would have been different had the expert witness testified at trial, he has failed to establish ineffective assistance. See Williams v. State, 303 Ga. 474, 477 (3) (813 SE2d 384) (2018). See also Matthews v. State, 301 Ga. 286, 289

---

explicitly testified at trial that the bullet that entered Helmuth's face exited through the neck and did *not* exit through the lower jaw.

[11] Those "lies" were: that Parker did not fight back (which was undermined by the medical/blood evidence and evidence that Helmuth's glasses, shoe, and hat had been knocked off before he was shot); that Helmuth prevented Parker from escaping (which was undermined by physical evidence at the crime scene); that Helmuth beat Parker throughout the house (which was undermined by evidence that nothing was disturbed in areas in which Parker claimed to have been beaten); that Helmuth knocked Parker into the bedroom (which was undermined by evidence that none of the items hanging in the small alcove outside the bedroom were disturbed); that Parker kept his .22 by his bed and not behind his bedroom door (which was undermined by evidence that the gun had left marks on the wall behind the bedroom door); that Helmuth was lunging at Parker when Parker shot him in the face (which goes to the expert's testimony about Helmuth's possible orientation when this shot was fired); and that Parker had no choice but to shoot Helmuth (which was undermined by evidence that Helmuth never entered the bedroom — or the alcove outside the bedroom — and that Helmuth was 15-20 feet away from Parker at the time that Parker went into the bedroom to get the .22).

(2) (800 SE2d 533) (2017) (decision not to call expert witness was reasonable where trial counsel presented defense through cross-examination and argument, and expert witness would not have rebutted the testimony provided by the State's witnesses).

(b) Parker also maintains that his trial lawyer should have moved to strike one of the jurors for cause or exercised one of his peremptory challenges against that juror. During voir dire, juror C. G. acknowledged that, in his job as a high school principal, he interacted "almost day-to-day working with the Jones County Sheriff's Department" and that this interaction would place him "in a predicament" if he served on the jury.[12] When the trial court asked if C. G.'s relationship with law enforcement would prevent him from being an impartial juror, C. G. responded, "No, of course not. But, again, if placed in that . . ." The trial lawyer did not seek to strike C. G., and C. G. served on the jury.

After C. G. acknowledged his relationship with law enforcement, he unequivocally agreed that he could "set everything aside and be a fair and impartial juror," and a motion to strike him for cause need not have been

---

[12] It also appears that Parker's children had previously attended the high school where C. G. worked. But C. G. did not recall having known them, and Parker does not assert that C. G. was biased as a result of any (potential) relationship with Parker's children.

granted. See Burney v. State, 299 Ga. 813, 816 (2) (792 SE2d 354) (2016). Accordingly, the failure to move to strike C.G. for cause was not deficient performance. See Phillips v. State, 277 Ga. 161, 162 (a) (587 SE2d 45) (2003). In any event, "[w]hich, and how many, prospective jurors to strike is a quintessential strategic decision." Simpson v. State, 298 Ga. 314, 318 (4) (781 SE2d 762) (2016) (citation and punctuation omitted). And "[t]rial tactics and strategy . . . are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." McNair v. State, 296 Ga. 181, 184 (2) (b) (766 SE2d 45) (2014) (citation and punctuation omitted). At the hearing on the motion for new trial, Parker's trial lawyer testified that he wanted intelligent jurors, that C. G. appeared to be intelligent and more educated than other potential jurors, and that he weighed C. G.'s relationships with law enforcement and decided not to exercise a peremptory challenge. Parker has failed to establish that his lawyer's strategic decision to include C. G. on the jury was unreasonable. Parker was not denied the effective assistance of counsel in connection with jury selection.

(c) Finally, Parker claims that his trial lawyer failed to sufficiently investigate his case. Had the lawyer done so, Parker says, he would have

learned that Darryl Howell — whom the lawyer called as a character witness — could also have testified as a fact witness. At the hearing on Parker's motion for new trial, Howell testified that he was present at Parker's house soon after the first responders arrived and that he was shocked at Parker's condition. Howell said he had "seen some ass-whippings in [his] day, but that is the second worse one I ever saw." But Parker himself could have informed his lawyer about Howell's presence at his home (although there is no evidence that he did so), and a lawyer's performance is not deficient for failing to discover information that easily could have been provided by his client. See Strickland, 466 U. S. at 691 (III) (A) ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."). Moreover, the police officers who observed Parker at his home and at the police station that morning testified that Parker's face was covered in blood (as observed by Howell), but that it became apparent — after his face was cleaned — that Parker had only superficial cuts on his face and bruising around both eyes. And the best evidence of Parker's physical condition are the photographs of him taken that morning at the police station. As a result, Parker was not prejudiced by the failure of his lawyer to elicit testimony from Howell about

Parker's physical condition, and this claim of ineffective assistance is without merit.

    <u>Judgment affirmed. All the Justices concur</u>.

Decided January 22, 2019 — Reconsideration denied February 18, 2019.

Murder. Jones Superior Court. Before Judge Brown.

Matthew K. Winchester, for appellant.

Stephen A. Bradley, District Attorney, Dawn M. Baskin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.