**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia


Decided: June 11, 2024


S24A0156.  HILL v. STATE.


WARREN, Justice.

In July 2019, James Hill, III, was convicted of malice murder in connection with the strangling death of Kelly Marshall.  He appeals this conviction, arguing that the evidence was not sufficient to support the conviction as a matter of constitutional due process or Georgia statutory law; that the trial court abused its discretion by denying his motions for mistrial after allegedly improper evidence was introduced and by failing to remove for cause eight potential jurors during voir dire; and that his trial counsel provided ineffective assistance by failing to move to strike for cause five of those potential jurors.[1]  For the reasons explained below, we affirm.

_____

[1] Marshall was killed in August 2017.  In June 2018, a Newton County grand jury indicted Hill for malice murder, felony murder, and aggravated

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. At about 10:00 a.m. on August 12, 2017, Marshall's body was discovered on the side of a river in Newton County by some people who had come to the river to kayak. She had been asphyxiated in a manner consistent with strangulation, and she was naked from the waist down.

At the time of her death, Marshall and Hill had been dating for about six months—although Marshall was married to a man, with whom she had two children, who was in prison. Marshall lived with her grandmother and father, and about a month before Marshall's death, Marshall's grandmother told Hill that he was not allowed in their home "because he hit" Marshall. At trial, family members and friends of Marshall and Hill testified about witnessing incidents of physical violence between Marshall and Hill.

assault. At a trial in July 2019, a jury found Hill guilty of all counts. The court sentenced him to serve life in prison for malice murder, and the other counts were merged or vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372 (434 SE2d 479) (1993). Hill filed a timely motion for new trial and amended it once with new counsel. After an evidentiary hearing, the trial court entered an order denying Hill's amended motion in February 2023. Hill filed a timely notice of appeal. The case was docketed to the term of this Court beginning in December 2023 and submitted for a decision on the briefs.

During one incident, Hill's aunt saw Marshall "trying to claw [Hill's] eyes out"; Hill then picked Marshall up "from her waist," holding her in a way "so she couldn't keep clawing his face," and carried her around the house. Marshall's daughter testified that during this incident, she saw Hill holding Marshall "against a wall with his hands around her neck." During another incident less than a month before Marshall's death, Marshall and Hill were arguing and Marshall's friend saw Marshall "with a bloody nose, freaking out, saying, 'he hit me, he hit me.'" Hill testified that during this incident, he "open-hand slapped" Marshall. And about two weeks before Marshall's death, Marshall's mother and sister saw Hill "sw[i]ng at [Marshall] and knock[] her across the kitchen," and then grab her "by the hair of the head." After this altercation, Marshall had "knots on her head" and bruises on her elbows and knees.

Witnesses also testified that Marshall's husband was a source of contention between Marshall and Hill. Marshall's daughter testified that if Marshall said "anything about my dad," Hill "would hit her and she would hit him back" and that on one occasion when

3

Marshall was "talking about getting back with my dad," Hill said, "you don't have a chance, neither of you have a chance." Similarly, one of Marshall's friends testified that he overheard an argument between Marshall and Hill, during which Marshall said she was going to be with her husband "when he came home," and Hill responded, "not if I can help it."

On August 11, 2017—the day before Marshall's body was discovered and about a week before Marshall's husband was scheduled to be released from prison on parole—Marshall spent the day with Hill and a friend, drinking and swimming. Hill testified that at the end of the day, he dropped off his friend at his house and then drove to Marshall's house. The friend later told people that Marshall and Hill argued on the drive home, and Hill said to Marshall, "I'm going to kill you tonight, b**ch."

Marshall's father and grandmother testified that Marshall, who was intoxicated, came home around 8:30 or 9:00 p.m., got a plate of food, and took it to her room. At about 11:30 p.m., she left her room and got a second plate of food, and then went back to her

4

room and shut the door. They did not see her again. At some point, Marshall's father and grandmother heard "loud thumping noises" coming from her room, which sounded "like she was moving furniture," but they did not check on her. The next morning, Marshall's father went to her room and discovered that her window was open and that her cell phone and purse were in the room, but Marshall was not.[2]

At trial, Hill testified that when he dropped Marshall off, he parked his white Oldsmobile Cutlass down the street so her grandmother would not see him, and after Marshall went inside, he met her at her window. They spent about 30 to 45 minutes together on her back porch before Hill left to drive to Atlanta, where he stayed for two days, until August 13.

On August 13, an officer from the Walton County Sheriff's Office, acting on an anonymous tip that a person driving a white Cutlass nearby "was suspected of murder," maneuvered his car to

---

[2] Marshall's father testified that there was an air conditioning unit outside Marshall's window that could be used as a step to climb out of the window.

follow the Cutlass. Hill "started swerving across the yellow lines," the officer "attempted to stop him," and the "vehicle fled." The officer chased Hill for about half a mile, reaching a speed of 100 miles per hour in a 45-mile-per-hour zone. Hill then crashed the Cutlass, and the officer arrested him.

Hill was interviewed by investigators from the Newton County Sheriff's Office on August 15 and said that he stayed at a strip club in Atlanta from around 11:00 p.m. on August 11 until the club closed at 3:00 a.m. the next morning. He then went to a hotel in Atlanta, where he stayed until August 13. When asked where his Cutlass was at 3:30 or 4:00 a.m. on August 12, he said it was parked "right down the street" from the strip club and explained that after leaving the club, he went "riding around" Atlanta and it "took [him] a while" to find a hotel room.[3]

Surveillance video from the strip club in Atlanta showed that Hill entered the club at 12:53 a.m. and left at 2:26 a.m. on August

---

[3] The lead investigator for the case testified that the hotel where Hill stayed was two to two-and-a-half miles away from the strip club.

12. However, his car did not remain in Atlanta: an officer from the Newton County Sheriff's Office saw Hill's Cutlass in Newton County at 3:40 a.m.[4]  Surveillance video from the hotel shows that Hill arrived at the hotel in Atlanta at 5:33 a.m.[5]

The State also presented evidence that one evening in 2010, when Hill was 16 or 17 years old, he was spending time with his ex-girlfriend and accused her of wanting to leave to spend time with one of her male friends.  He then strangled her to the point that she passed out, and she woke up with her pants and underwear on the ground.[6]  Hill later pled guilty to aggravated assault in connection

---

[4] At 3:12 a.m., someone called 911 and reported seeing a Cutlass that "had run off the road" in Newton County.  The officer who was sent to investigate saw a white Cutlass driving near the area and ran the license plate, which came back as registered to Hill.  The driver, however, was "driving fine," so the officer did not stop him.

[5] At trial, Hill explained this gap in time by testifying that after spending about an hour or an hour and a half at the strip club, he drove through Newton County to go back to his house in Walton County, near the Newton County line, to get more money, and then he returned to the hotel in Atlanta.  He acknowledged that he had not previously mentioned this purported trip home to the investigators.

[6] When the ex-girlfriend told her family about this incident, her brother confronted Hill.  Testimony about this incident is the subject of one of Hill's enumerations of error discussed in Division 3 below.

with this incident.[7]

1. Hill first argues that the evidence discussed above was not sufficient to support his conviction as a matter of constitutional due process. When reviewing this challenge, we view the evidence in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia,* 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Lopez v. State*, ___ Ga. ___ (898 SE2d 441, 445) (2024). Hill also argues that the evidence was not sufficient to support his conviction under OCGA § 24-14-6, which says: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."

---

[7] The State introduced evidence of this past act to show Hill's knowledge, intent, and motive and to negate mistake in this case. See OCGA § 24-4-404 (b). A limiting instruction was given before the evidence of the other act was introduced and a limiting instruction was also included in the final jury charge.

8

The evidence here, when viewed in the light most favorable to the jury's verdicts, showed that Hill had a history of physically abusing Marshall (as well as another girlfriend), threatened to kill Marshall the evening before she was found dead, was the last person to see Marshall on the night that she died, attempted to flee law enforcement officers, and then lied to law enforcement officers about where he was on that night Marshall died. The evidence presented at trial and recounted in part above was constitutionally sufficient to support the jury's conclusion that Hill murdered Marshall. See, e.g., *Lopez*, 898 SE2d at 445-446 (holding that the evidence was constitutionally sufficient to support the appellant's conviction for malice murder where the appellant and another person were the only people with the victim when he was shot, the appellant admitted that she and the victim "typically fought" and fought right before the shooting, and the appellant gave "shifting accounts" of how the shooting occurred); *Jones v. State*, 314 Ga. 400, 406 (877 SE2d 232) (2022) (holding that the evidence—which included that the appellant had been violent toward the victim in the past and had

9

lied to investigators about how the shooting occurred—was constitutionally sufficient to support the appellant's conviction for malice murder). And although the evidence was wholly circumstantial, it was sufficient to support the jury's rejection of every reasonable hypothesis save that of Hill's guilt; in particular, given the circumstances and Hill's initial failure to mention his trip home and back to Atlanta in the middle of the night, the jury could have rejected Hill's story about why he drove to Newton County. See, e.g., *Lopez*, 898 SE2d at 445-446 (holding that the evidence presented was also sufficient under OCGA § 24-14-6).

3. Hill argues that the trial court abused its discretion by denying his three motions for mistrial. For the reasons discussed below, we conclude that the trial court did not abuse its discretion.

(a) As noted above, the State introduced evidence that Hill strangled his ex-girlfriend about seven years before Marshall's death. To that end, Hill's ex-girlfriend testified that after Hill strangled her, her brother confronted Hill and the two "ended up fighting, fighting, fighting, and my brother seen some type of object

and we didn't realize it was a knife until he dropped it." Hill moved for a mistrial outside the presence of the jury, arguing that the testimony that Hill had a knife was unfairly prejudicial because it showed that Hill had committed another aggravated assault. The trial court denied Hill's motion.

Later that day, Marshall's mother testified on direct examination that she met Hill "once, maybe twice, that's it." On cross-examination, Hill's counsel tried to clarify how many times Marshall's mother had seen Hill, and she testified that she "met him briefly for five minutes at a gas station when he first had apparently gotten out of prison or whatever." Hill's counsel again moved for a mistrial outside the presence of the jury. The trial court denied the motion, concluding that the testimony about Hill being in prison was "just a passing comment."

Marshall's mother's then testified that the next time she saw Hill, he was at her mother and sister's house for "a few good minutes, long enough for him to jump on somebody else that was there viciously on the porch." Hill again moved for a mistrial outside the

presence of the jury, arguing that testimony that Hill "beat somebody up" was the third instance of inadmissible bad-character evidence admitted that day and "it's got to stop." The trial court denied the motion, again concluding that it "was just something in passing," but agreed to admonish future witnesses about what they were not supposed to say.

(b) On appeal, Hill argues that the trial court abused its discretion in denying each motion for mistrial, contending that each piece of testimony discussed above, individually and when viewed collectively, deprived him of a fair trial.

"Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Wilkins v. State*, 308 Ga. 131, 136 (839 SE2d 525) (2020) (citation and punctuation omitted). Even assuming all of the evidence about which Hill complains was inadmissible, Hill's contention fails because the statements, even considered cumulatively, were not so

prejudicial to him that they deprived him of his right to a fair trial.

Each piece of testimony was brief and non-responsive, and after Hill's counsel strategically objected (outside the presence of the jury so further attention was not called to the testimony), counsel moved on to other topics in questioning the witnesses. Moreover, we cannot say that the testimony at issue was particularly damaging to Hill's character. The testimony about Hill's knife did not clearly indicate that he used the knife during the fight, as opposed to simply possessing it. *Pate v. State*, 315 Ga. App. 205, 210 (726 SE2d 691) (2012) (explaining that "the mere fact that [the appellant] carried a knife" did not impute bad character). Cf. *Adams v. State*, 318 Ga. 105, 118 (897 SE2d 396) (2024) ("[G]un ownership and the custom of carrying a gun do not, by themselves, impute bad character.") (citation and punctuation omitted). It was unlikely that the jury was surprised to learn that Hill had been in prison because the jury also heard that Hill pled guilty to aggravated assault. See *Rodrigues v. State,* 306 Ga. 867, 872 (834 SE2d 59) (2019) (explaining that the harm of learning that the appellant had a prior

13

conviction was minimized by the fact that the jury was already aware that he was incarcerated at the time of the charged murder). See also *Brown v. State*, 307 Ga. 24, 33 (834 SE2d 40) (2019) ("[T]his passing and non-responsive reference to Appellant's personal information being included in a jail database did not amount to improper character evidence."). And multiple witnesses testified that Hill had been violent toward Marshall, so the additional vague information that he had "jumped on" someone "viciously" was unlikely to be particularly compelling to the jury. See *Kirby v. State*, 304 Ga. 472, 487 (819 SE2d 468) (2018) (explaining that the harm of the improper admission of evidence that the appellant had committed an armed robbery was mitigated in part by the fact that the "jury was already aware that [the appellant] had committed other violent crimes," including another robbery and an aggravated assault and attempted rape). Thus, the trial court did not abuse its discretion by denying Hill's motions for a mistrial. See *Swims v. State*, 307 Ga. 651, 655 (838 SE2d 751) (2020) (concluding that the trial court did not abuse its discretion in denying the appellant's

14

motion for mistrial after a witness made a "passing reference" to the appellant's incarceration "for an unstated crime," when the testimony was "an unexpected answer to the question asked by the prosecutor" and the prosecutor "did not inquire further in [the appellant's] crimes").

4. Hill contends that the trial court abused its discretion by failing to strike for cause eight prospective jurors. However, Hill did not move to strike for cause six of these prospective jurors. Thus, this enumeration of error is waived as to those six jurors. See *Passmore v. State*, 274 Ga. 200, 201 (552 SE2d 816) (2001) (holding that the appellant's claim that the trial court erred by not excusing a juror for cause was not preserved for appellate review because the appellant failed to challenge the juror for cause at trial); *Ashford v. State*, 271 Ga. 148, 148 (518 SE2d 420) (1999) (same). See also *Thompson v. State*, 294 Ga. 693, 700 (755 SE2d 713) (2014) (Nahmias, J., concurring specially) (explaining that, although this Court has sometimes considered whether a trial court "manifestly abused its discretion when it did not excuse . . . a juror for cause sua

15

sponte," the Court "has never explained the source of that duty," and concluding that the better approach is to follow the holding in *Passmore* and similar cases).

As to the two prospective jurors Hill moved to strike for cause, neither one of them served on his jury: Hill used a peremptory strike to remove one, and the State used a peremptory strike to remove the other. Thus, even if we assume the trial court erred by failing to remove those two jurors for cause, Hill cannot show harm, and his claim fails. See *Willis v. State*, 304 Ga. 686, 701-702 & n.2 (820 SE2d 640) (2018) (explaining that any trial court error in denying a defendant's motion to excuse a prospective juror is harmless where "the juror is subsequently removed from the defendant's twelve-person jury by [the defendant's] use of a peremptory strike" or by the State's use of a peremptory strike).[8]

---

[8] Hill also briefly argues as part of this enumeration that the judge "improperly rehabilitat[ed]" these eight prospective jurors using a "forced rehabilitative method" and implies that the trial court's questioning of the jurors resulted in them being "less candid and open." To the extent this argument differs from Hill's overall claim that the jurors should have been excused for cause, and even assuming he properly preserved this argument for

5. Finally, Hill argues that his counsel provided ineffective assistance by failing to move to strike for cause five of the jurors about which he complains in Division 4 above.[9]

To prevail on this claim of ineffective assistance, Hill must prove both that his lawyer's performance was deficient and that he was prejudiced by this deficient performance. See *Strickland v. Washington,* 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "[W]hich, and how many, prospective jurors to strike is a

---

appellate review, we reject it. Hill has not pointed to any questions by the trial court that constituted an improper attempt "to reject clear evidence of the juror's bias," and he has not cited any case from this Court, nor have we found any, indicating that trial courts should not pose questions to prospective jurors. See *Ellis v. State*, 292 Ga. 276, 286 n.7 (736 SE2d 412) (2013) (rejecting a claim of ineffective assistance for failure to object to "rehabilitative questions" because "the court did not engage in improper rehabilitation in order to reject clear evidence of the juror's bias"); *Ros v. State*, 279 Ga. 604, 606 (619 SE2d 644) (2005) (concluding that the voir dire testimony of the challenged juror "reflects that she had not formed an opinion on the guilt or innocence of the appellant" that was "fixed and definite" and holding that there was no merit to the appellant's "contention that the trial court engaged in an improper 'rehabilitation' of the juror"). See also *Anderson v. State*, 309 Ga. 618, 628 (847 SE2d 572) (2020) (explaining that "the scope of voir dire" is generally "left to the sound discretion of the trial court") (citation and punctuation omitted).

[9] Although, as noted above, trial counsel did not move to strike six of the jurors about which Hill complains in Division 4, Hill argues only that counsel provided ineffective assistance by failing to move to strike five of those jurors; he does not include one of the jurors in this ineffective-assistance claim.

quintessential strategic decision," which will be grounds for concluding that trial counsel was deficient only if the decisions "are so patently unreasonable that no competent attorney would have chosen them." *Parker v. State*, 305 Ga. 136, 142 (823 SE2d 313) (2019) (citation and punctuation omitted). "To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Welbon v. State*, 304 Ga. 729, 731 (822 SE2d 277) (2018). "If a defendant fails to meet his burden on one prong of the two-prong test, then the other prong need not be reviewed by the Court." Id.

Only one of the jurors about which Hill complains was seated on Hill's jury. This juror raised his hand when Hill's counsel asked if there was anyone "who feels that they are not the juror for this case for any particular reason." The juror explained that he had "a 23-year-old daughter and a 17-year-old-daughter" and "I don't feel like I need to see any pictures or any—I don't think I'd be able to make—." The court explained that everyone brings "their baggage"

18

and asked if the juror could "set that aside and listen to the facts and evidence in this case." The juror responded: "I can attempt to. I'm just being totally honest with you. I can attempt to." He further said, "I can attempt to do it based off just the facts that are being presented on both sides."

A juror may be excused for cause if he "holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will not be able to set it aside and decide the case on the evidence or the court's charge on the evidence," but "a potential juror is not disqualified as a matter of law when he or she expresses doubt about his or her own impartiality or reservations about his or her ability to put aside personal experiences." *Jones v. State*, 314 Ga. 605, 614 (878 SE2d 505) (2022). Although the juror at issue here expressed some reservations about his ability to serve as a juror in this case, his responses did not indicate that he had a "fixed and definite" opinion of Hill's guilt. Id. On the contrary, the juror said that he would listen and attempt to decide Hill's guilt or innocence "based off just the facts that are being presented on both sides." Hill

19

has thus failed to show that a motion to strike this juror for cause would have succeeded. See *Terrell v. State*, 313 Ga. 120, 126 (868 SE2d 764) (2022) (holding that the appellant had not shown that a motion to strike a juror would have succeeded where, although the juror said that "she might be influenced by her cousin's conviction for armed robbery and her ex-boyfriend's shooting," she also said that she "would attempt to separate" her prior experience "from anything she heard in the case and would do her best to be fair"). Thus, Hill has failed to show deficient performance or prejudice as to this juror. See *Parker*, 305 Ga. at 142-143 (holding that the appellant failed to show that counsel's failure to move to strike a juror for cause was deficient performance because "a motion to strike [the juror] for cause need not have been granted"); *Thompson v. State*, 304 Ga. 146, 150 (816 SE2d 646) (2018) (holding that the appellant failed to show prejudice from his counsel's decision not to move to strike the juror for cause because "there is no indication that a challenge for cause would have been successful").

As to the remaining four prospective jurors that Hill claims

counsel should have sought to strike for cause, these jurors were not seated on Hill's jury, so Hill has failed to show prejudice.[10]  See *Welbon*, 304 Ga. at 731-732 (concluding that the appellant failed to show "a  reasonable probability that the outcome of his case would have been different but for trial counsel's alleged deficiency" of failing to move to strike a prospective juror for cause because the appellant used a peremptory strike to remove that juror and "he has not shown that any challenged juror who served on his jury was unqualified").

Thus, Hill's claim of ineffective assistance of counsel fails.

*Judgment affirmed.  All the Justices concur.*

---

[10] Hill used peremptory strikes to remove two of the jurors, and the jury was selected before the other two jurors' numbers were called.