## S98A1193. SUITS v. THE STATE.
### (507 SE2d 751)

SEARS, Justice.

The appellant, Marcus Suits, appeals from his conviction for malice murder stemming from the death of Melinda Garrett and from his conviction for possession of a firearm during the commission of a felony.[1] On appeal, Suits raises numerous issues, including that the trial court erred in admitting hearsay, and erred in permitting the medical examiner to testify that the cause of death was a homicide and not a suicide. With regard to Suits's contentions, we conclude that all but two of them are without merit, and that, as for those two contentions, if any error occurred, it was harmless. Accordingly, we affirm.

1. On April 24, 1995, the Hall County Police Department and other emergency personnel responded to a 911 call at the mobile home of Suits and Melinda Garrett. Upon arriving, firemen found Melinda lying on a sofa with a large head wound covered with towels. A baby lay next to Melinda, covered in blood, but unharmed. Melinda, who was right-handed, had a pistol in her left hand. At the crime scene, Suits told police officers that he had taken a gun from the bedroom to kill himself because his life was a "mess," but that Melinda had taken the gun from him. Suits stated that he then went back to the bedroom, and that, when he came back into the living room, Melinda, while holding their son Zachary, shot herself in the head. Suits also stated that he and Melinda had argued that day. Suits added that he had put the towels around Melinda's wounds.

Suits later changed his story in his second statement to the police. He stated that Melinda was sitting on the sofa with the gun cocked when he, while standing in front of her, tried to take the gun from her. As he struggled to get the gun from her, he stumbled backwards as she grabbed the gun's barrel. According to Suits, the gun accidentally discharged, striking Melinda in the head. In addition,

---

[1] The crime occurred on April 24, 1995, and Suits was indicted on May 15, 1995. Suits was found guilty on August 28, 1996, and sentenced that same day. Suits filed a motion for new trial on September 27, 1996. The court reporter certified the trial transcript on October 15, 1996. Suits filed an amended motion for new trial on March 11, 1997, and the trial court denied Suits's motion for new trial, as amended, on November 20, 1997. Suits filed a notice of appeal on December 19, 1997. The case was docketed in this Court on April 22, 1998, and was orally argued on July 14, 1998.

Suits stated that he and Melinda had argued because Jody Jones, a friend of Melinda's, would not be coming to their home that evening as originally planned. He added that Melinda then asked him to go to Jones's house in Lawrenceville, Georgia, but that "it kinda pissed me off" because he did not want to go "down to her (Jones's) house and sit around." Suits also stated that he and Melinda had argued that day about his ex-wife, and that Melinda "was always throwing up this stuff about my ex-wife."

Over defense counsel's hearsay objection, the trial court permitted Jody Jones and Amanda Garrett, the victim's sister, to testify about statements made to them by the victim. Jones testified that she had originally planned to come over that night for a sexual "threesome" with Suits and Melinda Garrett, but that she later changed her mind. Jones added that she and Melinda had been friends for some years, but had fallen out of communication with one another until recently. Jones stated that on the day that Melinda died, she had spoken with her twice. Jones testified that Melinda told her that she and Suits were arguing because Jones would not come over, and that at one point during the second conversation, Melinda whispered to Jones, "well here he comes, I got to go." Jones also stated that she had spoken to Suits once that day about the threesome, and that he had talked dirty to her.

Amanda Garrett testified that she went to Melinda's house twice on the day she died. During her first visit around 1:00 p.m., Amanda said that she did not notice anything unusual between Melinda and Suits. On her second visit around 6:00 p.m., however, Amanda returned to the trailer to find Melinda crying and upset. Amanda said that she had returned to bring Melinda's seven-year-old son home. Amanda testified that Melinda told her that she, the victim, did not want her son to stay with her that night because she and Suits were arguing. Amanda added that during the two years that Melinda and Suits had lived together that Melinda had called her two to three times a week crying about her relationship with Suits, and that Melinda told her that she and Suits were having problems because of Suits's ex-wife.

Several investigators testified that, at the crime scene, there was hair, bone fragments, bullet fragments, brain matter, and blood on the living room floor, on the north wall of the living room, on several pieces of furniture located near the north and west walls of the living room, and on the floor and a piece of furniture located in a hallway that opens to the living room along its west wall and the west corner of the north wall. The sofa on which Suits stated that the victim was sitting when they struggled for the gun and she was shot was located immediately against the east wall of the living room. The crime scene investigators testified that there was no blood, hair, or brain matter

on the wall behind the sofa. In addition, there was testimony that some of the brain matter and blood that were on the walls and furniture some distance from the sofa were traveling at a high velocity at impact, and that the type of splatter created by such impact was inconsistent with the blood or brain matter having been placed on the walls or furniture by a towel.

There was also evidence that the gun that killed Melinda Garrett, a .357 magnum revolver weighing about three pounds, required a significant amount of force to be fired, and would not fire accidentally. Moreover, a DNA analyst testified that there was no fine mist of blood on the gun, and that she discovered only one speck of blood on the gun by using a large magnifying scope.

The State's medical examiner testified that the cause of death was a gunshot wound, and that the manner of death was a homicide. He added that the bullet entered the top left side of the victim's head, to the left of center; that the bullet struck at an acute angle so that it struck "more of a glancing," instead of a direct, blow; that the path of the bullet was from the back of the victim's head to the front; that the force of the blast fragmented and blew off a large portion of the top front part of the victim's head; that the bullet fragmented when it hit the skull; that some bullet fragments traveled downward at an angle of about thirty degrees and lodged behind the victim's right eye; and that some bullet fragments exited her scalp and struck one of her arms, which had to have been raised to be struck by the fragments. He added that, based upon his examination of the entry wound and the location of the fragments, the bullet did not travel from the front of the victim's head to the back, and the victim could not have been shot while facing the shooter. He also testified that the victim could not have shot herself because it would be difficult for a person to shoot herself in the top of the head, and because, if a person managed to shoot herself in the top of the head, there would be significant gunpowder deposited underneath the bone of the skull, on top of the bone, and in and around the scalp, none of which he found in this case. He added that he based the latter finding upon his examination of hundreds of people who have shot themselves in the head or chest, and on his knowledge that a .357 revolver, the weapon used in this case, would deposit a dense amount of gunpowder from a distance of up to three feet. The medical examiner offered no opinion regarding whether the shooting in this case was accidental or intentional.

Reviewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found Suits guilty beyond a reasonable doubt of the crimes for which he was convicted.[2]

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Suits contends that the trial court erred in allowing into evidence under the necessity exception to the hearsay rule the testimony of Jody Jones and Amanda Garrett regarding statements made to them by Melinda Garrett.

"The two prerequisites for the admission of hearsay because of necessity are 1) necessity, and 2) particularized guarantees of trustworthiness. *McKissick v. State*, 263 Ga. 188 (429 SE2d 655) (1993)."[3] Moreover, "the proponent of the evidence must show that the statement is relevant to a material fact and that the statement is more probative on that material fact than other evidence that may be procured and offered."[4]

In this case, the necessity requirement is established by Melinda Garrett's death.[5] As for the trustworthiness requirement, we conclude that it is satisfied with regard to the statements she made to her sister, in that there was evidence that the victim placed "great confidence" in her sister and often turned to her "for help with her problems,"[6] in particular her problems regarding her relationship with Suits. In addition, the evidence was relevant to demonstrate the intensity of the difficulties between Melinda and Suits on the evening of the crime, and the State had no other witnesses who saw Melinda on the evening of the crime and who knew the history of the difficulties of the relationship between Suits and Melinda.[7] For these reasons, we conclude the trial court did not err in admitting Amanda Garrett's testimony.

Moreover, with regard to Jody Jones's testimony, we conclude that, even if the trial court erred in admitting it, the error was harmless, as other admissible evidence generally covered the same subject matter as the statements that Jones testified that Melinda Garrett made to her.[8]

3. Suits also contends that the trial court erred in allowing the medical examiner to testify, over defense counsel's objection, that Melinda Garrett died as a result of a homicide and not a suicide. We need not decide, however, whether the trial court erred in permitting the medical examiner to give this conclusion,[9] as we find that, if any error occurred in permitting the testimony, the error was harmless. The reason is that the plain and overwhelming inference to be drawn from the forensic evidence provided by the medical examiner's testimony was that the shooting was not a suicide. We therefore cannot

---

[3] *Roper v. State*, 263 Ga. 201, 202 (429 SE2d 668) (1993).
[4] *Chapel v. State*, 270 Ga. 151, 155 (510 SE2d 802) (1998).
[5] Id.
[6] *Roper* at 203. Accord *McGee v. State*, 267 Ga. 560, 566 (5) (480 SE2d 577) (1997).
[7] *Chapel* at 155.
[8] *Roper* at 203.
[9] See *Maxwell v. State*, 262 Ga. 73, 76 (5) (414 SE2d 470) (1992).

conclude that the fact that the medical examiner offered this conclusion created any harmful error.[10]

4. Suits contends that the trial court erred in admitting into evidence inflammatory and repetitive photographs of the crime scene and of the victim. However, because Suits identifies "no specific photograph . . . as having been admitted erroneously, . . . this contention presents nothing for review."[11] Moreover, the record demonstrates that the photographs were relevant to aid in explaining the cause and manner of the victim's death.[12]

5. During voir dire, the State asked prospective jurors if they had ever been arrested. Juror number 17 failed to respond. After this juror was selected to serve on the jury, the State discovered that he in fact had previously been arrested. The State moved to remove the juror from service, and the trial court granted the State's motion, and replaced the juror with an alternate. Suits contends that the trial court erred in removing the juror. However, after the jury is selected and before the State begins its case, the trial court may hear " 'newly discovered evidence to disprove the juror's answer.' "[13] Further, "[Suits] has not shown how he was prejudiced by the use of an alternate, since pursuant to OCGA § 15-12-169 alternates are selected in the same manner and must have the same qualifications as members impaneled as the jury."[14] Accordingly, we conclude that the trial court did not abuse its discretion in removing juror 17.

6. Suits's final contention is that the trial court erred in giving a sequential charge on malice murder and involuntary manslaughter. Suits relies on *Edge v. State*[15] and *Cantrell v. State*[16] to support this contention. *Edge,* however, is inapplicable to this case, as *Edge* concerned a sequential charge on felony murder and voluntary manslaughter and this case concerns a sequential charge on malice murder and involuntary manslaughter.[17] *Cantrell* is also inapplicable because the trial court in this case did not charge the jury that it had to reach a unanimous agreement on malice murder before it could

---

[10] See *Coleman v. State,* 257 Ga. 313, 314 (2) (357 SE2d 566) (1987); *Anderson v. State,* 258 Ga. 278, 279 (3) (368 SE2d 508) (1988).

[11] *Carr v. State,* 265 Ga. 477 (2) (457 SE2d 559) (1995).

[12] Id.; *Holland v. State,* 267 Ga. 833, 836-837 (2) (483 SE2d 584) (1997).

[13] *Washington v. State,* 253 Ga. 173 (2) (318 SE2d 55) (1984), quoting OCGA § 15-12-167.

[14] See *Forney v. State,* 255 Ga. 316, 317 (1) (338 SE2d 252) (1986); *Payne v. State,* 195 Ga. App. 523, 524 (2) (394 SE2d 781) (1990).

[15] 261 Ga. 865 (414 SE2d 463) (1992).

[16] 266 Ga. 700 (469 SE2d 660) (1996).

[17] *Jackson v. State,* 267 Ga. 130, 133 (12) (475 SE2d 637) (1996); *Smith v. State,* 265 Ga. 495, 496 (3) (458 SE2d 347) (1995); *McNeal v. State,* 263 Ga. 397, 398 (2) (435 SE2d 47) (1993).

consider involuntary manslaughter.[18]
*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 23, 1998 —
RECONSIDERATION DENIED DECEMBER 17, 1998.

*H. Bradford Morris, Jr.,* for appellant.
*Lydia J. Sartain, District Attorney, Nick Jovanovich, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Angelica M. Woo, Assistant Attorney General,* for appellee.

