FINAL COPY
309 Ga. 562

S20A1006.  GIBBS v. THE STATE.

McMILLIAN, Justice.

Appellant Rodney Gibbs was convicted of the felony murder of Marquis Stephens, the aggravated assaults of six other people, and numerous other crimes, all in connection with a shooting at a house party.[1] Following the trial court's denial of his motion for new trial,

---

[1] Stephens was killed on October 7, 2015. On January 29, 2016, a Fulton County grand jury returned a 30-count indictment charging Gibbs and Kevin Reeves jointly for the malice murder of Marquis Stephens (Count 1); four counts of felony murder (Counts 2-5); first-degree burglary (Count 9); seven counts of criminal attempt to commit armed robbery (Counts 10-16); seven counts of aggravated assault with a deadly weapon (Counts 17-23); first-degree criminal damage to property (Count 24); aggravated cruelty to animals (Count 25); and possession of a firearm during the commission of a felony (Count 26). Gibbs was separately indicted for two counts of felony murder predicated on possession of a firearm by a convicted felon (Counts 7 and 8) and two counts of possession of a firearm by a convicted felon (Counts 29 and 30). Reeves was separately indicted for felony murder of Stephens predicated on possession of a firearm by a first-offender probationer (Count 6) and two counts of possession of a firearm by a first-offender probationer (Counts 27 and 28).

Gibbs was tried alone from December 12 to 15, 2017. The jury found Gibbs guilty on Counts 4, 5, 7, 8, 17-26, 29, and 30 and not guilty on Counts 2 and 9. The jury did not reach a verdict on Counts 1, 3, or 10-16; the State and Gibbs agreed to accept a mistrial on those counts, which the State ultimately elected to nolle pros. The trial court sentenced Gibbs to serve life in prison

Gibbs appeals, arguing only that the evidence was insufficient to support his convictions.

When considering the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted). "Our review leaves to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be made from the evidence." *Yarn v. State*, 305 Ga. 421, 423 (2) (826 SE2d 1)

---

without the possibility of parole for felony murder (Count 4), twenty years concurrent for each of six counts of aggravated assault (Counts 18-23), ten years concurrent for criminal damage to property (Count 24), five years concurrent for aggravated cruelty to animals (Count 25), five years for possession of a firearm during the commission of a felony (Count 26) (consecutive to the sentence for Count 4), and fifteen years for possession of a firearm by a convicted felon (Count 29) (consecutive to the sentence for Count 26). The remaining counts were either vacated by operation of law or merged for sentencing purposes.

Gibbs filed a motion for new trial on January 3, 2018, which he amended through new counsel on August 6, 2018. Following a hearing, the trial court denied Gibbs' motion (as amended) on September 3, 2019. Gibbs filed a notice of appeal to this Court, and this case was docketed to the April 2020 term and thereafter submitted for a decision on the briefs.

(2019).

Viewed in the appropriate light, the evidence at trial showed that, on the evening of October 7, 2015, a group of friends gathered at the home of James and Katherine McLester for a fish fry and television viewing party. While waiting for the television show to air, James, Quartez Lindley, Jerome Moss, and Kevin Butler were in the dining room playing dominoes, while Stephens looked on from a chair in a corner of the dining room, near the entrance to the kitchen. Katherine and Randy Snipes were in the kitchen. Around 9:30 p.m., Gibbs and his co-indictee Kevin Reeves came to the house; Gibbs went to the dining room while Reeves waited outside. According to the McLesters, this was the first and only time that Gibbs came to their home; the McLesters denied inviting either Gibbs or Reeves into the home.[2]

Gibbs approached the men playing dominoes and said to James, "Let me get some loud," which James understood to mean

_____

[2] There was testimony that Gibbs was let into the home by one of James' friends, Darryl McLendon.

that Gibbs wanted to buy marijuana.[3] Gibbs and James had a brief argument over the price of marijuana, with Gibbs indicating that James' price was too high. Gibbs then went to the front door and asked Reeves to come into the house and give him five dollars. Gibbs returned to the dining room and said to James and the other men playing dominoes, "Motherf***er, y'all know what it is,"[4] and pulled a "big pistol" out of his pants. Gibbs pointed the gun at each person sitting at the domino table and then fired. The men sitting at the domino table flipped the table for cover, and James could hear Katherine screaming from the kitchen. Katherine and Snipes testified that they hid behind the refrigerator.

After Gibbs began shooting, Stephens, who was also armed, drew his own weapon and fired it once; the bullet struck Gibbs in the right hand and traveled through his hand to strike his right thigh. Gibbs returned fire, striking Stephens in the abdomen. Gibbs

---

[3] Though James denied selling marijuana, Katherine testified that, at the time of the crimes, she and James made a living selling marijuana.

[4] Multiple witnesses testified that they understood this statement to mean they were about to be robbed by Gibbs and Reeves.

and Reeves continued firing their weapons as they backed out of the house and across the yard. The McLesters' dog chased the men out of the house and into the front yard, where she was shot and killed. Combined, Reeves and Gibbs fired their weapons a total of 15 to 18 times, leaving numerous bullet holes in the kitchen and dining room areas inside the home, as well as in the home's exterior. After Gibbs and Reeves fled the property, the McLesters and their guests loaded Stephens into the bed of a truck and transported him to a hospital, where he later died as a result of the gunshot wound.

The victims at the McLesters' house knew Gibbs only by his nickname, "Strip." Levester Lowe, a friend of the McLesters who was out of town on the night of the shooting, knew Gibbs and often gave him rides. Lowe testified that Moss, one of the men at the domino table, called him on the night of the shooting and told him that Strip was one of the shooters. When Lowe returned to Atlanta, he took a detective to Gibbs' house. James, Lindley, Moss, and Butler all later identified Gibbs as one of the shooters from a six-person photographic array.

At trial, a Clayton County police officer testified that, at approximately 11:00 p.m. on the night of the shooting, he responded to a report of a person shot at the Southern Regional Medical Center. There, he met with Gibbs, who claimed that he did not know how he sustained his injuries. Gibbs told the officer that he was drinking and smoking marijuana with friends and later woke up in a grocery store parking lot with gunshot wounds. He claimed that he was transported to the hospital by an unknown man, though he could not describe either the man or his vehicle. The officer returned to the parking lot but found no evidence to corroborate Gibbs' story.

Gibbs' theory of defense at trial was that he and Reeves acted in self-defense after Stephens withdrew his weapon and fired first; Gibbs also called the victims' credibility into question by casting them as drug dealers and drug users. Gibbs did not testify or put on any evidence in support of his defense. The parties stipulated that Gibbs was a convicted felon at the time of the incident, having previously been convicted of a felony involving the use of a firearm.

As for the convictions for felony murder and aggravated

assault, Gibbs argues, as he did below, that the incident was the result of a drug deal gone awry and that he shot Stephens in self-defense. In support of this argument, Gibbs points to an ambiguous statement made by James to a detective shortly after the shooting that, in Gibbs' estimation, demonstrates that Stephens shot first. But "[q]uestions about the existence of justification are for the jury to resolve, and the jury may reject any evidence in support of a justification defense and accept evidence that a shooting was not done in self-defense." *Goodson v. State*, 305 Ga. 246, 248 (1) (b) (824 SE2d 371) (2019). See also *Starks v. State*, 304 Ga. 308, 309 (1) (818 SE2d 507) (2018) (evidence was sufficient to support felony murder conviction where appellant shot and killed armed victim during drug transaction despite conflicting testimony as to whether appellant or victim drew and fired his weapon first). Gibbs also argues that the victims were not credible and that they fabricated their account of the crime to cover up their participation in illegal activities, but this argument is likewise unavailing because, like the question of justification, witness credibility is for the jury to decide. See *Yarn*,

305 Ga. at 423 (2); *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)). The evidence recounted above was more than sufficient to support Gibbs' convictions for the felony murder of Stephens and the aggravated assaults of the six surviving victims.[5]

Gibbs also argues that the evidence was insufficient to support his conviction for animal cruelty because no one saw him shoot the McLesters' dog. However, the State presented testimony that the dog ran out of the house in pursuit of Gibbs and Reeves and that there was no evidence that anyone other than Gibbs and Reeves were firing shots outside the home. The jurors were "entitled to draw reasonable inferences from [this circumstantial] evidence based on

---

[5] Gibbs further argues that the evidence was insufficient to support his conviction for the aggravated assault of Katherine. Specifically, he notes that the indictment charged him with the aggravated assault of Katherine Davidson but that no one by that name testified at trial and that the record is void of any indication that Katherine McLester and Katherine Davidson are the same person. However, this claim is belied by the record: James testified that his wife's name is Katherine Davidson McLester.

their own common-sense understanding of the world," *McKie v. State*, 306 Ga. 111, 115 (829 SE2d 376) (2019) (citation and punctuation omitted), and find Gibbs guilty, either directly or as a party to the crime, of cruelty to an animal. See *Lowe v. State*, 295 Ga. 623, 625 (1) (759 SE2d 841) (2014) ("[T]he fact that the evidence against [the appellant] was largely circumstantial does not render it insufficient; questions as to the reasonableness of hypotheses other than the guilt of the defendant are generally for the jury to decide, and this Court will not disturb a finding of guilt unless the evidence is insupportable as a matter of law.").

With respect to his remaining convictions, Gibbs generally asserts that the supporting evidence was insufficient but does not offer any specific argument in support of this claim. Having reviewed the record, we conclude that the evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Gibbs was guilty of the crimes of which he was convicted. See *Jackson*, 443 U.S. at 319 (III) (B).

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 10, 2020.

Murder. Fulton Superior Court. Before Judge Russell.

*Deborah L. Leslie*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Mathew E. Plott, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.