NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: November 5, 2024

S24A0884.  POUNDS v. THE STATE.

WARREN, Justice.

William C. Pounds III was convicted of malice murder and other crimes in connection with the shooting death of Kendra Jackson.[1]  On appeal, Pounds contends, among other things, that

---

[1] The crimes occurred on June 12, 2015.  In December 2015, a Bibb County grand jury indicted Pounds for malice murder, felony murder, and aggravated assault.  Pounds was tried from October 18 to 24, 2017.  The jury found Pounds guilty of all counts, and on October 25, the trial court sentenced him to life in prison without the possibility of parole for malice murder.  The aggravated assault count merged with the malice murder count for sentencing.  The trial court purported to merge the felony-murder count into the malice-murder conviction, but the felony-murder count was actually vacated by operation of law.  See *Malcolm v. State*, 263 Ga. 369, 371-372 (434 SE2d 479) (1993).

Pounds filed an untimely motion for new trial, which the trial court purported to deny even though it lacked jurisdiction to do so; the trial court then granted Pounds an out-of-time appeal, and Pounds filed a notice of appeal. But because the untimely motion for new trial ripened upon the grant of the out-of-time appeal and was thus still pending, we held that the notice of appeal had not ripened and dismissed the appeal, noting that if the trial court entered

the trial court committed several evidentiary errors and that his trial counsel provided constitutionally ineffective assistance. For the reasons explained below, we affirm.

1. The evidence presented at Pounds's trial showed the following. Jackson and Pounds met in early 2000 and began a long-term relationship. In September 2005, Pounds met and became romantically involved with another woman, Vicinda Crawford. For the next 10 years, Pounds maintained romantic relationships with

an order denying the motion, the notice of appeal would ripen. See *Pounds v. State*, 309 Ga. 376, 385 n.12 (846 SE2d 48) (2020) ("*Pounds I*").

On remand, on March 17, 2021, the trial court purported to dismiss the motion for new trial, and on July 19, 2023, the trial court granted Pounds an out-of-time appeal. Pounds's second appeal was then transmitted to this Court as if his notice of appeal had ripened. However, neither the 2021 or the 2023 order recognized that *Pounds I*'s holding—that the motion for a new trial was procedurally proper and remained pending—was the law of the case, see OCGA § 9-11-60 (h); neither order resolved the motion for new trial on the merits; and thus neither order was effective to allow the notice of appeal to ripen under the law-of-the-case effect of *Pounds I*. Accordingly, on February 6, 2024, we issued an order vacating the March 17, 2021 and July 19, 2023 orders, dismissing Pounds's second appeal, and directing the trial court to enter an order resolving the pending motion for new trial on the merits. We again explained that if the trial court entered an order denying that motion for new trial, Pounds's notice of appeal would ripen.

On remand, on March 7, 2024, the trial court entered an order denying the motion for new trial on the merits. Pounds's notice of appeal ripened, and the case was docketed to the August 2024 term of this Court and submitted for a decision on the briefs.

both women.  During that period, both women became aware of the other's relationship with Pounds.  Yet Pounds was repeatedly able to convince each woman that he had left the other and wanted to be with her.  Throughout this ten-year period, Pounds became engaged to each woman, sometimes to both at once.

On Sunday, May 31, 2015—"Pastor Appreciation Day" at the church where Pounds was the pastor—Pounds brought Jackson with him to church, and Crawford came separately to church to surprise him.  At the church, the two women saw each other and began text messaging each other after the service.  These texts led the women to discover that Pounds was cheating on each woman with the other, despite presently being engaged to be married to Crawford.  Through their text messages, Crawford and Jackson consoled each other over their situation with respect to Pounds.  Crawford, however, remained engaged to Pounds.  The two set a wedding date of June 12, 2015.

In the early morning hours of the day of June 12, 2015—the date Crawford and Pounds had set for their wedding—Pounds was

3

not with Crawford, but with Jackson. Pounds called 9-1-1 from his house and reported that Jackson had committed suicide. After calling 9-1-1, Pounds turned Jackson's body over and "started to try and resuscitate her." Jackson was later found unresponsive in an upstairs bedroom, having died of a single, contact gunshot wound to the right side of the head.

Pounds first spoke to police at around 12:30 a.m. on the day of the shooting. Pounds said the couple had an argument during which he told Jackson he no longer wanted to be in a relationship with her; Jackson then told him that "if we're going to separate, then one of us is going to have to leave the world"; Jackson walked over to Pounds's dresser and picked up a handgun and pressed it to her head; and Pounds "attempted to lunge at her" to prevent her from shooting herself, but he "was too late." Soon after, Pounds told a first responder "that he was downstairs and he heard a shot, and he went upstairs and that's where he had found" Jackson. At around 1:00 a.m., Pounds called a friend, Joey Mullinax, and told Mullinax that he had come home early from a trip to Dallas, had argued with

4

Jackson about her infidelities, and that Jackson "had grabbed his pistol and shot herself."

Later, Sergeant Shelley Rutherford arrived at the scene and spoke to Pounds, who said he and Jackson were lying in bed together when the conversation turned into an argument about their relationship; Jackson got up, dressed, came to his side of the bed, and grabbed his gun from his chest of drawers; she then went to the foot of the bed and pointed the weapon at him; Pounds initially thought she was going to shoot him, and he went under the covers; and he then moved to the end of the bed and tried to grab the gun, touching it before it went off.

At around 5:30 a.m., Pounds gave the Sergeant a formal statement that was transcribed. Pounds stated that on the day of the shooting, he began talking to Jackson about ending their relationship; she began screaming; Jackson kept repeating that if she could not have Pounds, neither one of them would live; he tried to talk her down; when he tried to grab the gun, she turned it from pointing at him to herself; he remembered hearing one gunshot; and

he then put on his pants, called 9-1-1, turned Jackson over as instructed, and tried to resuscitate her. Pounds initially said that Jackson had the gun in her left hand and her pocketbook in her right hand, but later said that it was possible that she had the gun in her right hand.

Six days after the shooting, during a follow-up interview, Pounds demonstrated to Sergeant Rutherford how the shooting occurred. According to Pounds, he was kneeling on the bed and Jackson was standing in front of him, pointing the gun at him and holding it "in between the two of them." Pounds then grabbed the gun, causing the gun to go off and Jackson and Pounds to fall off the bed together. In Pounds's demonstration, he indicated that the gun was not touching Jackson's head. This was the first time Pounds stated that he had also fallen to the floor. On August 14, 2015, about two months after the shooting, Pounds was arrested.

At trial, the State's expert in crime-scene reconstruction and blood-pattern analysis testified that he saw "no evidence that [Jackson] had the gun in her hand" and "fire[d] the fatal gunshot."

6

The expert testified that, based on the blood coagulation he observed, "it's not difficult to say it had to have been at least 10 minutes" that Jackson was laying facedown before Pounds turned her over and that, in his opinion, "there was seven and a half minutes between the injury and the 911 call." The expert added that he was "confident [Jackson] was not standing" when she was shot and that her head was below the level of the bed at the time of the shooting.

The State also called several witnesses, including a friend who testified about Pounds's infidelities and the conflicting stories Pounds told him about what happened leading up to Jackson's death, and two of Jackson's coworkers, who testified that Jackson "loved her life," had spoken about "future plans that she had made with [Pounds] or friends and family members," and had once stated that if it was ever said Jackson committed suicide, "don't believe it." In addition, the State also called Jackson's daughter to testify that, around 2007 or 2008, Pounds had hit Jackson and given her a black eye, and, around 2009, Pounds "came into [Jackson's] house and . . .

7

kicked the front door in," forced Jackson into his car, and "drove away" with her.

Pounds testified at trial in a manner consistent with portions of his pre-trial communications with police, including by testifying that he had hidden under the covers when Jackson pulled out a gun. Unlike in two of his earlier accounts to police, however, Pounds testified that when he came out from under the covers, Jackson was pointing the gun at herself. And unlike in his three earlier accounts to police, he testified that he begged her not to shoot herself as he moved towards her, and that he lunged off the bed and put his "hands on her hands" while she was holding the gun.

2. Pounds argues that the evidence was not sufficient as a matter of constitutional due process to support his conviction for malice murder.[2] See *Jackson v. Virginia,* 443 U.S. 307, 318-319 (99

---

[2] To the extent Pounds challenges the verdicts on all three counts, Counts 2 (felony murder) and Count 3 (aggravated assault) are moot because those counts were merged or vacated by operation of law. See *Malcom*, 263 Ga. at 372. See also *Anderson v. State*, 299 Ga. 193, 196 n.4 (787 SE2d 202) (2016) (explaining that a defendant is not "convicted" on counts that are vacated or that merge with other offenses for sentencing purposes, and challenges to the sufficiency of the evidence to support those non-existent convictions are moot).

SCt 2781, 61 LE2d 560) (1979). In reviewing this claim, "we view all of the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Moulder v. State*, 317 Ga. 43, 46-47 (891 SE2d 903) (2023). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Perkins v. State*, 313 Ga. 885, 891 (873 SE2d 185) (2022) (citation and punctuation omitted).

The evidence at Pounds's trial, viewed in the light most favorable to the verdicts, authorized the jury to find Pounds guilty beyond a reasonable doubt of malice murder. A person commits malice murder if "he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). Among other things, the evidence showed that Pounds and Jackson had a tumultuous and, at times, violent relationship; Crawford, Pounds's fiancée, testified that she and

9

Pounds were engaged and that Pounds had planned to marry her on the same day as Jackson's death; Pounds offered multiple, conflicting accounts of what had happened before the shooting and what his involvement was; and two of Jackson's coworkers testified that Jackson "loved her life," had spoken about her "future plans," and had once stated if anyone was ever to say that she committed suicide, "don't believe it."[3] Additionally, the jury heard testimony from the State's blood-coagulation and crime-scene reconstruction expert, who testified that, based on the evidence at the scene of the shooting, he concluded that after Jackson had been shot, Pounds left Jackson laying facedown "for at least 10 minutes" before Pounds turned her over, and that there "was seven and a half minutes between the injury" and the time Pounds called 9-1-1. The State's expert further testified that there was no evidence Jackson "had the

---

[3] In Division 3, we assume, without deciding, that the trial court erroneously admitted the testimony from Jackson's coworkers pursuant to OCGA § 24-8-803 (3) and OCGA § 24-8-807. But when performing sufficiency review, we consider all the evidence admitted at trial, even if the evidence was admitted erroneously. See *Thomas v. State*, 308 Ga. 26, 28 (838 SE2d 801) (2020) ("[A] sufficiency review under *Jackson* considers all evidence, whether admissible or not").

10

gun in in her hand" or that she was "in a standing position" when she was shot. To the contrary, the State's expert testified that he found "evidence that would suggest it's not likely" that Jackson was "in possession of the weapon at th[e] moment" she was shot.

Presented with this evidence, a reasonable jury could find Pounds guilty beyond a reasonable doubt of malice murder. See *Davenport v. State*, 309 Ga. 385, 389 (846 SE2d 83) (2020) (evidence presented was constitutionally sufficient to support defendant's convictions for malice murder when the State's forensic pathology expert and crime scene investigation expert both determined the cause of death to be homicide, rather than suicide); *Suits v. State*, 270 Ga. 362, 362-364 (507 SE2d 751) (1998) (evidence presented was constitutionally sufficient to support defendant's conviction for malice murder when the defendant claimed that he tried to stop victim from committing suicide, but defendant had previously given the police conflicting accounts of what had happened before the shooting).

3. Pounds contends that the trial court abused its discretion

11

by admitting under OCGA § 24-8-803 (3) (Rule 803 (3)) out-of-court statements that Jackson made to her coworkers, Laquisha Jordan and Jackie Bush. Assuming without deciding that the trial court abused its discretion when it admitted Jackson's statements to Jordan and Bush under Rule 803 (3), we conclude that any error in doing so was harmless.

(a) Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c). Hearsay is generally inadmissible, but it may be admitted if any of several statutory exceptions applies. See OCGA § 24-8-802; *State v. Hamilton*, 308 Ga. 116, 121 (3) (839 SE2d 560) (2020). One such exception is Rule 803 (3), which allows for the admission of a statement of a declarant's "then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health." OCGA § 24-8-803 (3). This Court has not meaningfully addressed the state-of-mind exception to the hearsay rule under our current Evidence Code except to

12

pretermit whether evidence would have been admissible under that exception. See *Lynn v. State*, 310 Ga. 608, 618 (852 SE2d 843) (2020) (pretermitting whether a witness's testimony would have been admissible under the state-of-mind exception under Rule 803 (3) and concluding that the evidence "did not prejudice [the defendant] given the strength of the evidence against him").

(b)  Prior to trial, the State sought a ruling admitting several statements that Jackson had made to close friends about her future plans with friends and family members. Over Pounds's objection, the trial court decided to admit those statements under Rule 803 (3). At trial, Jordan, who worked with Jackson and had been friends with her since 2010, testified that, a few months before Jackson was shot and killed, Jordan told Jackson that someone in Jordan's life had a "bout with suicide," that Jordan would never commit suicide, and that if Jackson "ever heard that about [Jordan], don't believe it." Jackson "said the same thing": "you know how much I love life, you know how much I love my kids, you know how much, you know, we have just plans for things, so that—if anybody ever told you that [I

13

committed suicide], you make sure you look in to it."

Like Jordan, Bush also testified regarding Jackson's outlook and plans for the future. Bush and Jackson were long-time friends, but lost touch with each other a few years before Jackson's death. Bush testified that she had reconnected with Jackson in April 2015, a few months before Jackson was shot. Bush had two children at that point and was pregnant with a third child. She testified that Jackson was surprised that Bush had two children and that Jackson was "kind of sad" that she had "missed out on those types of events in our lives together." Bush added that "this was . . . our opportunity to have that experience together, so [Jackson] was excited to know" the gender of the baby Bush was having and "wanted to be a part of shopping and helping to decorate his nursery."

Assuming without deciding that the trial court's admission of Jackson's and Bush's statements under Rule 803 (3) was an abuse of discretion, we conclude that any error in admitting these statements was harmless. Under the nonconstitutional harmless-error standard, we examine "whether it is highly probable that the

14

error did not contribute to the verdict" by "review[ing] the record de novo and weigh[ing] the evidence as we would expect reasonable jurors to have done so." *Jackson v. State*, 306 Ga. 69, 80 (829 SE2d 142) (2019) (citation and punctuation omitted).

Here, the evidence showed that Pounds was the only other person present at the time of the shooting, suggesting that either Jackson shot herself or that Pounds shot her. To disprove Pounds's defense theory that Jackson died by suicide, the State presented evidence from an expert in crime-scene reconstruction and blood-pattern analysis that there was "no evidence that [Jackson] had the gun in her hand" and "fire[d] the fatal gunshot," that Pounds had waited nearly 10 minutes after the shooting before turning Jackson's body over or calling 9-1-1, and that Pounds provided contradictory accounts of how Jackson died. In light of all of this evidence against Pounds, we conclude that it is highly probable that any error in admitting the out-of-court statements that Jackson made to Jordan and Bush regarding Jackson's state of mind did not contribute to the verdict, and was therefore harmless. See *Nundra*

15

*v. State*, 316 Ga. 1, 9-10 (885 SE2d 790) (2023) (concluding that, because of the strength of the evidence against the defendant, "the risk that evidence [improperly admitted] would lead the jury to convict [the defendant] for some reason other than guilt was fairly low"). Accordingly, this enumeration of error fails.[4]

4. Pounds contends that the trial court abused its discretion in admitting certain other-acts evidence under OCGA § 24-4-404 (b) (Rule 404 (b)). See OCGA § 24-4-404 (b) ("Evidence of other . . . acts shall not be admissible to prove the character of a person . . . [i]t may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident").

---

[4] We also note that, over Pounds's objection, the trial court admitted the statements under OCGA § 24-8-807 (Rule 807) (the "residual exception" to the rule against hearsay). In fact, it did so before admitting them under Rule 803 (3). But see *State v. Hamilton*, 308 Ga. 116, 124 n.10 (839 SE2d 560) (2020) (cautioning trial courts that "the residual exception applies *only* to statement(s) not specifically covered by any law") (emphasis original) (citation and punctuation omitted). But even assuming that the trial court abused its discretion in admitting the hearsay statements under Rule 807, Pounds's claim still fails under the nonconstitutional harmless-error standard, and does so for the same reasons that his claim fails with respect to his argument about Rule 803 (3).

16

Specifically, the trial court admitted testimony from Chelsey Brunson, Jackson's daughter, that Pounds hit Jackson and caused her to suffer a black eye approximately eight years before Jackson's death, and that Pounds kicked Jackson's front door in and "drove away" with her approximately six years before Jackson's death. The State offered this evidence for the purpose of showing Pounds's "feelings for [Jackson], the nature of their relationship, [Pounds's] mindset and intent and the time of the alleged criminal act" and for the purpose of refuting Pounds's defense of suicide, and the trial court admitted it over Pounds's objection.

Pounds contends that the other acts the State introduced at trial occurred eight years prior to his trial[5] and were therefore so remote in time that their probative value was substantially outweighed by the danger of unfair prejudice. See *Hood v. State*, 299 Ga. 95, 102 (786 SE2d 648) (2016) (explaining that "the part [of

---

[5] Unlike Brunson, Pounds asserts that both acts occurred eight years before Jackson's death. Because we assume, without deciding, that the trial court erred in admitting this other-acts evidence, it is not necessary to resolve the discrepancy in timing with respect to those acts.

17

the Rule 404 (b) analysis] that looks to the probative value of evidence determined to be relevant . . . requires analysis of the other acts evidence under OCGA § 24-4-403"). See also OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."); *Rooks v. State*, 317 Ga. 743, 757 (893 SE2d 899) (2023) (noting that one of the "[f]actors to be considered in determining the probative value of other act evidence offered to prove intent" is "its temporal remoteness") (citation and punctuation omitted). The State responds that the evidence of "domestic violence between the parties" was probative of "the nature of the relationship between the parties, shed[] light on [Pounds's] conduct toward the victim, was offered to rebut Pounds's defense theory that Jackon died by suicide, and that "an eight-year lapse in time does not render the evidence inadmissible, but instead goes to its weight and credibility for the jury to determine."

18

We need not decide whether the trial court abused its discretion in admitting evidence of these prior acts, because any error in admitting it was harmless. As we discussed in Division 4 above, "[t]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Baker v. State*, 318 Ga. 431, 448 (899 SE2d 139) (2024) (citation and punctuation omitted). And as we also discussed above, the jury was presented with ample evidence of Pounds's guilt. Pounds admitted that he was alone with Jackson when she died, the jury heard testimony from the State's expert in crime-scene reconstruction and blood-pattern analysis that there was "no evidence that [Jackson] had the gun in her hand" or "fire[d] the fatal gunshot," and the physical evidence indicated that Pounds waited nearly 10 minutes after Jackson was shot to roll her over and call 9-1-1. And the strength of this evidence, combined with the fact that Pounds told multiple stories about what occurred prior to the shooting, outweighed any prejudice from Brunson's testimony that on two occasions several years before the charged crime, Pounds

19

acted violently toward Jackson. See *Davenport*, 309 Ga. at 389-390 (concluding that any error by the trial court in admitting evidence that the defendant abused his ex-wife more than 20 years before the victim's death was harmless because "the evidence presented against [the defendant], though circumstantial, was very strong"); *Williams v. State*, 302 Ga. 147, 152-154 (805 SE2d 873) (2017) (concluding that any error by the trial court in "admitting evidence of [the defendant's] violent acts against two ex-girlfriends" was harmless, in part, because the defendant "admitted that [the victim] had died in his presence and "[t]he physical evidence contradicted [the defendant's claim that he had tried to revive [the victim]"). We therefore conclude that it is highly likely that the admission of Brunson's testimony did not affect the jury's verdicts, and Pounds's claim fails.

5. Pounds contends that the trial court abused its discretion by admitting "character" evidence against Pounds. Specifically, he complains that the trial court should not have allowed "Joey Mullinax . . . [to] testif[y] that [Pounds] once commented to him

about having multiple relationships with women" other than Jackson and Crawford. Pounds argues that "[w]hether [he] had relationships with other women had no relevance to the issues at trial and could only go to putting [him] in a bad character light." .

It is unclear from Pounds's brief on appeal whether he challenges the admission of this testimony as not relevant under OCGA § 24-4-401 (Rule 401), as inadmissible other-acts evidence under Rule 404 (b), or both; he cites no statutes or cases to support this enumeration of error. The trial court's ruling was likewise unclear, but the trial transcript suggests that the trial court admitted the evidence under Rule 404 (b).[6] But because Pounds cites no legal authority and offers no legal analysis to support this claim of error, we conclude that he has abandoned it. See Supreme Court Rule 22 (1) ("Any enumerated error not supported by argument or citation of authority in the brief shall be deemed

---

[6] With respect to this ruling, the trial court stated: "If that's the extent of the question, [counsel], I'll let you ask it, but I don't want to hear anymore else about it." And the ruling was made in response to argument that the evidence was not merely "bad character" evidence, but that it "fits the motive of our case." The Georgia Evidence Code was not discussed or cited.

21

abandoned."). See also *Collins v. State*, 312 Ga. 727, 748 (864 SE2d 85) (2021) (bald assertion that testimony was "'inadmissible hearsay intentionally solicited by the State'" was deemed abandoned because appellant neither "cite[d] Georgia's Evidence Code nor offer[ed] legal analysis to support his contention on appeal").

6. Pounds contends that the trial court abused its discretion in ruling that one of the State's witnesses, Ross Gardner, was qualified to give expert testimony about blood coagulation. As with his fifth enumeration of error, Pounds cites no legal authority and offers no legal analysis to support this claimed error, so we conclude that he has abandoned it. See Supreme Court Rule 22 (1); see also *Sauder v. State*, 318 Ga. 791, 816 n.21 (901 SE2d 124) (2024) (under Supreme Court Rule 22 (1), when an appellant "makes no specific argument and cites no authority to support any of the[ir] claims, . . . we do not address them").

7. Pounds contends that his counsel provided constitutionally ineffective assistance when he failed to object to a certain juror remaining on the jury. Pounds's claim fails.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient, and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington,* 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Hill v. State*, 319 Ga. 250, 257 (9 SE2d 101) (2024). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013). See also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694.

Pounds argues that trial counsel rendered ineffective assistance by failing to object to a certain juror remaining on the jury after the juror revealed that she knew Jackson's stepmother. After the State rested, the juror informed the trial court that she

had recently realized that she knew Jackson's stepmother because the two had worked together some time ago for the same supervisor, although they did not "really speak . . . much" anymore but "maybe . . . see each other's posts on Facebook." During questioning outside the presence of the jury, the trial court asked the juror if that relationship would affect her ability to listen to the evidence presented at trial or her ability to be fair and impartial. The juror said that she "would make the decision that I feel is right, because someone's life to me is more important than a friendship ultimately," and she agreed that while it might be difficult, she "could render a decision based on the evidence in this case and not [the] relationship." She also stated that although she might be "sympathetic personally," she knew "the right thing to do for me would be to make the right decision based on what I think it is," and that "[e]ven though I might still feel bad about it, . . . I would feel even worse about making the wrong decision." Pounds's trial counsel testified that he made "a strategic decision" not to request that the juror be removed from the jury, in part, because he "like[d]

24

jurors that feel the gravity of the case" as opposed to jurors "who [will] cavalierly convict your client." The trial court later denied a new trial on this ineffectiveness claim on the basis that the juror at issue had explained that her relationship with Jackson's stepmother would not have an effect on her ability to be fair and impartial, and trial counsel elected not to attempt to remove the juror "as a matter of trial strategy."

Pounds has not established that trial counsel's failure to object to the juror remaining on the jury constituted deficient performance. A trial court may replace a juror with an alternate when, as relevant here, the juror "upon other good cause shown to the court is found to be unable to perform his duty." OCGA § 15-12-172.[7] But "the court has broad discretion to determine whether it is appropriate to remove a juror." *Ware v. State*, 305 Ga. 457, 462 (826 SE2d 56) (2019) (citation and punctuation omitted). As we have previously

---

[7] OCGA § 15-12-172 provides in full: "If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated."

explained, "[a] conclusion on an issue of juror bias is based on findings of demeanor and credibility which are peculiarly in the trial court's province." *Bridges v. State*, 314 Ga. 395, 398 (877 SE2d 261) (2022) (citation and punctuation omitted).

The juror at issue in this case made specific statements to the trial court expressing her intention to make an impartial decision even though she had worked with Jackson's stepmother, and the trial court was authorized to conclude that the juror could be fair and impartial. Pounds has "offered no reason to discredit those responses," and the juror's relationship with Jackson's stepmother therefore "afforded no basis" for her removal. See id. at 165. See also, e.g., *Terrell v. State*, 313 Ga. 120, 124-126 (868 SE2d 764) (2022) (holding that the trial court did not abuse its discretion in failing to excuse a juror for cause who stated during voir dire that, despite "her cousin's conviction for armed robbery and her ex-boyfriend's shooting . . . she would attempt to separate those issues from anything she heard in this case and would do her best to be fair"); *Brockman v. State*, 292 Ga. 707, 723 (739 SE2d 332) (2013)

26

(holding that there was no abuse of discretion when the trial court denied a motion to strike a prospective juror for cause who stated during voir dire that he "tended to be analytical, that he could be fair about the case, and that his relationship with the victim's brother would not consciously affect his ability to be impartial").

Given that Pounds has offered no other reason this juror should be disqualified, we cannot say that trial counsel's performance was objectively unreasonable, and therefore deficient, in this regard. Pounds's claim of ineffective assistance of counsel thus fails. See *Neal v. State*, 313 Ga. 746, 752 (873 SE2d 209) (2022) (concluding that, because a juror provided credible responses to the trial court affirming her impartiality, the defendant failed to show that his counsel was deficient in failing to move to strike the juror).

8. In his final enumeration, Pounds correctly contends, and the State concedes, that the trial court erred when it failed to vacate the felony murder count and instead purported to merge it with the malice murder count. See *Worthen v. State*, 304 Ga. 862, 864-865 (823 SE2d 291) (2019). "This error in nomenclature was harmless,

27

however, because [Pounds] was not convicted of or sentenced for the felony murder count[]." Id. at 865. As a result, we need not take any action on this claim.

9. Finally, we consider whether the combined prejudicial effect of the errors we assumed warrants a new trial. In our review of Pounds's claims, we have assumed, without deciding, that the trial court abused its discretion in admitting Jordan's and Bush's testimony about Jackson's out-of-court statements under Rule 803 (3) and Rule 807 and in admitting Brunson's testimony about Pounds's prior acts under Rule 404 (b). Pounds has not claimed cumulative error and therefore has not made any specific argument as to why these errors in combination prejudiced his defense, and we see none. See *White v. State*, 319 Ga. 367, 398 n.17 (903 SE2d 891) (2024).

*Judgment affirmed. All the Justices concur.*

28