NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 10, 2025

S25A0661.  LEWIS v. THE STATE.

MCMILLIAN, Justice.

Appellant Latif Arthur Lewis was convicted of malice murder and other charges in connection with the shooting death of Randy Killens, Jr.[1]  On appeal, Lewis contends that the evidence was not

---

[1] Killens died on April 5, 2018.  On May 23, 2018, a Ware County grand jury indicted Lewis for aggravated assault (Count 1), felony murder (Count 2), malice murder (Count 3), possession of a firearm during the commission of a felony (Count 4), possession of a firearm by a convicted felon (Count 5), and simple battery (Counts 6 and 7).  Lewis's ex-girlfriend Cynthia Rowell was also indicted with aggravated assault as a party to the crime, and she later pleaded guilty, agreeing to testify truthfully as part of her plea deal.  At a trial from December 2 through December 5, 2019, the jury found Lewis guilty of all counts except Count 5, which the State nolle prossed.  The trial court sentenced Lewis to life in prison without the possibility of parole for malice murder, plus five years to serve consecutively for the firearm count on which he was convicted and concurrent 12-month sentences in prison for the simple batteries.  The trial court initially imposed a sentence on the aggravated assault count but later entered an amended sentence merging that count for sentencing purposes.  The trial court purported to merge the felony murder count, but it actually was vacated by operation of law. See *Noel v. State*, 297 Ga. 698, 700 (2) (777 SE2d 449) (2015).

Lewis filed a timely motion for new trial on December 17, 2019, which

sufficient as a matter of constitutional due process to support his convictions and that his trial counsel rendered ineffective assistance by not allowing Lewis to review all of the discovery in his case. For the reasons that follow, we affirm.

The evidence presented at trial showed that Lewis shot Killens after a physical altercation with Killens the previous day. Rowell, who was dating Lewis until after the shooting, testified that Lewis and Killens argued the night before the shooting over a marijuana transaction, and "[b]oth of them just went to taking their shirts off and they got into a[n] altercation, a fight." Lewis got "beat up. And so he was mad."

The next day, Killens called Rowell because Lewis had apparently sent a picture to Killens of the house where Killens's young son lived, so Killens said, "Please just make sure that Latif don't go by my house." During that call, Killens also informed

---

was amended by new counsel. Following a hearing on October 11, 2023, the trial court denied Lewis's motion for new trial, as amended, on October 23, 2023. Lewis filed a timely notice of appeal on November 21, 2023, and the case was docketed to the April 2025 term of this Court and thereafter submitted for a decision on the briefs.

Rowell that Killens could "shoot up" Lewis's house if he wanted.

Lewis was listening in on the call. Later that day, Lewis told Rowell

that he and Killens had agreed to meet to fight again, and she drove

Lewis to the agreed upon meeting place. Rowell testified that when

she pulled up, a friend of Killens approached her window to talk,

and

> [h]e was saying, like "Don't – don't be clutching. Don't let
> him be clutching." I was like, "I don't understand what
> that means." So, I'm trying to get him to tell me what
> that means and that's when all of a sudden somebody had
> walked up to our car on the side where [Lewis] was sitting
> at. I don't know who that was. I don't think they had
> nothing to do with this. But – and then so after that I was
> like – [the friend at the window] was like "A gun, the gun."
> By that time [Lewis] was already out of the car, in front
> of the car, looked like he was wrapping something around
> his hand. And he walked up to [Killens] and like pointed
> down and shot him in the leg.

Killens "just fell and was like, 'Somebody please help me.'" Lewis

"casually walked back to the car and got in" with "the gun in his

hand," and "[h]e was just like, 'Drive. . . . Go home. . . . If you don't

go home, . . . I'm going to kill your family. I'm going to kill you. . . .

Because you're the only person that can, I guess, say what happened,

who knows what happened.'"

Killens died at the scene.  His autopsy showed that he was shot in the thigh, with the bullet traveling in a "slightly downward trajectory" and severing his femoral artery, causing massive blood loss and death.

Law enforcement officers learned of Rowell's involvement in the shooting early in their investigation.  A law enforcement officer spoke to her on the telephone on the night of the killing, but she initially refused to provide any information.  She agreed to come with her mother to the police department a couple days later but initially denied any knowledge or involvement in the incident, before acknowledging that she was present when a shooting took place but saying that she thought everyone there had guns.  Soon afterward, officers arrested Rowell on the charge of accessory to murder, and the same day, Rowell provided officers with the account comporting with her trial testimony and told officers where they could find Lewis.  She acknowledged at trial that her final version of events differed from her initial statements, testifying further that "[b]efore

4

I had left from around [Lewis] he had told me multiple times we needed to get our stories together. He had told me basically what he wanted me to say to make it look like he didn't, you know, I guess, intend to hurt him." Rowell testified at trial that contrary to her previous statements to police, she never saw that Killens or any of the individuals who were present with him had a gun at the time of the shooting and that none of them ever made her feel like she was in danger. No other witnesses testified that they saw Killens or anyone other than Lewis with a firearm or any other type of weapon, and no weapon was recovered near Killens's body.

After Rowell's arrest, officers began "rolling around" the area where she said they could find Lewis. Eventually, one officer observed Lewis "run past . . . carrying a camouflage jacket and it appeared to be something under the jacket." The officer pursued Lewis and "saw a foot diving through a [house's] window," so officers set up a perimeter around the house. Officers were able to make contact with the homeowner, who said he "believed somebody was in the guest bathroom with the door locked." After the SWAT team

5

was activated, an officer tried to convince Lewis to come out peacefully, with no response, so, according to the officer, "I instructed one of the other sergeants to grab their long gun . . . . And as soon as I said that, Mr. Lewis said, 'I give up.' He surrendered. . . . and we arrested him there on the spot." Officers received the homeowner's consent to search the house, and in the bathroom where Lewis had been trapped, they found the camouflage jacket along with a bag with a Taurus 9mm handgun in it; the homeowner confirmed that the items did not belong in the house. A GBI firearms examiner determined that the gun had fired a casing that was recovered from the crime scene.

Lewis testified in his own defense at trial. According to Lewis, he and Killens had not gotten along previously; Killens regularly "provoke[d]" him and cursed at him during their interactions; and he got in a fight with Killens the day before the shooting, when Killens "rushed [him], grabbed [him], [and] slammed [him]," causing Lewis to bleed. Lewis said that he went home with Rowell after the fight, "was angry. . . . upset about the fight," and demanded from

6

Rowell to know "Where does [Killens] stay?" She showed Lewis Killens's address from an old message she had on Facebook, and Lewis took a screenshot of Killens's house and sent it to Killens from Rowell's Facebook account. The next day, Killens called them, "hollering" and saying, "How would you feel if I go to your house in the hill and shoot your house up," and "If I wanted to I'll shoot your house up." The two agreed to meet that afternoon to fight again. Lewis testified that afterward, an acquaintance informed him that Killens was "running around asking people to borrow . . . guns." Lewis testified that when he arrived for the fight, Killens, who said they were in his territory, was with two other people—one of whom kept "reaching" and demanding that Lewis "just get out the car," plus there was yet another person nearby "reaching up under the house for something" who then "started charging towards the car." At that point, Lewis got out of the car, and according to Lewis, the two people with Killens pulled out guns. Lewis testified that "when I started walking over there towards where Mr. Killens was[,] Mr. Killens went to try to turn. And when he went to try to turn I don't

7

know if he was reaching to grab a firearm or what, when he went to try to turn I pointed the gun like this (Demonstrating) downward towards the thigh and I shot"; Killens "fell and was like, 'Somebody help.' . . . I walked and got back in the car . . . [and] was like, 'Drive.'"

1. Lewis contends that the evidence was not sufficient as a matter of constitutional due process to support his convictions for murder and possession of a firearm during the commission of a felony because he acted in self-defense in shooting Killens.[2] Pointing to the evidence, consisting mainly of his own testimony, that Killens had been provoking Lewis for some time; that Killens had sought to borrow a firearm on the day of the incident; that Killens led Lewis to meet Killens in Killens's territory, where Killens was accompanied by two armed men; and that a third man reached beneath a nearby home and charged towards him, Lewis argues that

---

[2] Lewis also argues that the evidence was not sufficient to support his conviction for aggravated assault, but that conviction was merged for sentencing purposes, so that contention is moot. See *Lupoe v. State*, 284 Ga. 576, 577 (1) n.2 (669 SE2d 133) (2008) (holding that contention that evidence was insufficient to support conviction was moot because the trial court merged that count into another count for purposes of sentencing). Lewis does not argue that the evidence was insufficient to support his convictions for simple battery, which were based on him spitting on law enforcement officers after his arrest.

the evidence was clear that he acted in self-defense and had no other choice but to shoot Killens.

When this Court evaluates the constitutional sufficiency of the evidence, "we review whether the evidence presented at trial, when viewed in the light most favorable to the jury's verdicts, enabled the jury to find the defendant guilty beyond a reasonable doubt of the crimes of which [he] was convicted." *Fitts v. State*, 312 Ga. 134, 141 (3) (859 SE2d 79) (2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). "In conducting that review, we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Parker v. State*, 320 Ga. 572, 575 (1) (910 SE2d 580) (2024) (citation and punctuation omitted).

"When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." *Williams v. State*, 316 Ga. 147, 150 (1) (886 SE2d 818) (2023) (citation and punctuation omitted).

9

But "[i]t is the role of the jury to evaluate the evidence and, when doing so, the jury is free to reject any evidence in support of a justification defense and to accept the evidence that the [act] was not done in self-defense." Id. (citation and punctuation omitted); see also *Gibbs v. State*, 309 Ga. 562, 565 (847 SE2d 156) (2020) ("[T]he question of justification . . . is for the jury to decide.").

Here, the evidence heard by the jury included Rowell's testimony that she witnessed the entire incident and that Lewis exited her vehicle, "walked up" to an unarmed Killens, "pointed down and shot him in the leg," "casually walked back to the car and got in," and demanded that she drive him away—while threatening her life and the lives of her family members because she was "the only person" who could "say what happened, who knows what happened." Also, other than Lewis's self-serving testimony, no other witness testified that they saw Killens or anyone other than Lewis with a firearm or any other type of weapon that day, and no weapon was recovered near Killens's body.

We conclude that a reasonable jury was authorized to resolve

any conflicts or inconsistencies in the evidence and to reject Lewis's version of events and find him guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Parker*, 320 Ga. at 575-76 (1) ("[T]he jury was authorized to find [defendant] not credible, resolve conflicts in the evidence against him, and find him guilty of the crimes of which he was convicted."); *Orr v. State*, 312 Ga. 317, 319 (1) (862 SE2d 513) (2021) ("[B]ased on the evidence presented at trial and recounted above, the jury was authorized to reject Orr's theory of self-defense and find him guilty beyond a reasonable doubt of the crimes of which he was convicted."); *Taylor v. State*, 303 Ga. 624, 626 (1) (814 SE2d 353) (2018) ("It is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." (citation and punctuation omitted)); *Morris v. State*, 301 Ga. 702, 705 (1) (b) (804 SE2d 42) (2017) (reiterating that "questions about the existence of justification are for the jury to resolve. The jury is free to reject any evidence in support of a justification defense and to accept the

evidence that the shooting was not done in self-defense" (citation and punctuation omitted)). Accordingly, this enumeration of error fails.

2. Lewis also contends that his trial counsel rendered constitutionally ineffective assistance in not allowing him to review all of the discovery in his case. But Lewis provides no argument whatsoever explaining how counsel's performance was deficient or prejudicial. Nor does he cite any authority in support of this claim. We therefore deem this claim abandoned. See Supreme Court Rule 22 ("Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned."); *Pounds v. State*, 320 Ga. 288, 297 (5) (908 SE2d 631) (2024) ("[B]ecause [appellant] cites no legal authority and offers no legal analysis to support this claim of error, we conclude that he has abandoned it.").

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, LaGrua, Colvin, and Pinson, JJ, concur.*

12